UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

WALTER E. BURROWS,               CIVIL ACTION
        Appellant              NO. CV08-0375-A

VERSUS

MICHAEL J. ASTRUE, COMMISSIONER    JUDGE DEE D. DRELL
OF SOCIAL SECURITY,              MAGISTRATE JUDGE JAMES D. KIRK
        Appellee


REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE

Walter E. Burrows ("Burrows") filed an application for disability insurance benefits ("DIB") on July 11, 2006, alleging a disability onset date of February 15, 2006 (Tr. p. 38), due to sleep apnea, heart failure, high cholesterol, and high blood pressure (Tr. p. 67). That application was denied by the Social Security Administration ("SSA") (Tr. p. 21).

A de novo hearing was held before an administrative law judge ("ALJ") on September 18, 2007, at which Burrows appeared with a vocational expert ("VE"). The ALJ found that, although Burrows suffers from severe hypertension, sleep apnea, and obesity, he has the residual functional capacity to perform light work with unlimited pushing/pulling, occasional climbing, balancing, stooping, kneeling, crouching, and crawling, no work with concentrated exposure to fumes, odors, dusts, or gases, and no work in a poorly ventilated environment (Tr. p. 15). The ALJ concluded

that Burrows can perform his past relevant work as a grocery store manager and, therefore was not under a disability as defined by the Social Security Act at any time through the date of the ALJ's decision on November 29, 2007 (Tr. p. 19).

Burrows requested a review of the ALJ's decision, but the Appeals Council declined to review it (Tr. p. 3), and the ALJ's decision became the final decision of the Commissioner of Social Security ("the Commissioner").

Burrows next filed an appeal for judicial review of the Commissioner's final decision. Burrows raises the following issues for review on appeal:

> 1. The ALJ and the Appeals Council erred in failing to properly develop the record in light of Burrows' unrepresented status, which resulted in a decision that was flawed throughout the evaluation process.
>
> 2. The ALJ erred in assessing Burrows' residual functional capacity, resulting in an erroneous determination that Burrow could return to his past relevant work or, alternatively, that there were other jobs he could perform.

The Commissioner responded to Burrows' appeal and Burrows' filed a reply brief. Burrows' appeal is now before the court for disposition.

### Eligibility for DIB

To qualify for disability insurance benefits, a plaintiff must meet certain insured status requirements, be under age 65, file an application for such benefits, and be under a disability as defined by the Social Security Act. 42 U.S.C. 416(i), 423. Establishment

of a disability is contingent upon two findings. First, a plaintiff must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. 423 (d)(1)(A). Second, the impairments must render the plaintiff unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. 423(d)(2).

## Summary of Pertinent Facts

Burrows was 37 years old at the time of his September 18, 2007, administrative hearing (Tr. p. 148), had a high school education (Tr. p. 150), and had past relevant work experience as a self-employed deck builder, a security guard, doing maintenance, as a grocery store manager, as a grill cook, as a customer service representative at Wal-Mart, as a cashier, as a carpet cleaner, and doing line work in the food processing plant (Tr. pp. 76-77, 152-156).

In February 2006, Burrows was examined for chest pain and shortness of breath (Tr. p. 114). Burrows blood pressure was 148/70 (Tr. p. 112) and his obesity was noted (Tr. pp. 110-112). Chest x-rays showed Burrows' heart is normal, but he had very poor inspiration (Tr. p. 114). A CT scan of his chest showed no evidence of pulmonary embolus, pleural effusion, or adenopathy (Tr. p. 113). Burrows was diagnosed with non-cardiac chest pain and

GERD, and was prescribed Pepcid (Tr. p. 109).

Three weeks later, in March 2006, Burrows reported that he was still having shortness of breath (Tr. p.115).

In September 2006, Burrows had an internal medicine consultative examination with Dr. Jeff Kenny (Tr. pp. 117-120). Dr. Kenny found Burrows can stand for 15 minutes at a time for up to one hour in an eight hour day, can walk on level ground for one block, can sit for two hours, can lift fifty pounds, and can do household chores including sweeping, shopping, mopping, climbing stairs, vacuuming, mowing grass, and washing dishes, but is not able to drive a car (Tr. p. 117). Dr. Kenny noted that Burrows had consistently been gaining weight, was 6'2" tall and weighed 400 pounds, and has edema in his ankles and feet, mainly when he has been on his feet all day (Tr. p. 118). Burrows had a waddling gait, was able to get on and off the exam table and up and out of a chair without difficulty, was fully able to walk on his heels and toes, was able to squat, had a normal range of motion, and had no neurological deficits or atrophy (Tr. pp. 118-119). Dr. Kenny was unable to take any x-rays due to Burrows habitus[1] (Tr. p. 119). Dr. Kenny concluded that Burrows is an extremely obese male with a history of hypertension but no medication, and no other limitations (Tr. p. 120).

In October 2006, Burrows saw Dr. Bruce Craig for complaints of

---

[1]  Body build and constitution.

chest pain for about three months and that he stopped breathing while sleeping (Tr. p.141). Dr. Craig found Burrows was 6'1" tall, weighed 324 pounds, has blood pressure of 132/84, and was not taking any medications (Tr. p. 141). Dr. Craig found Burrows had sleep apnea and congestive heart failure (Tr. p. 141).

Burrows went to the emergency room in February 2007 due to coughing and shortness of breath (Tr. p. 124), was diagnosed with bronchitis, dyspnea, and hypertension, and was discharged with medication for his cough and hypertension (Tr. p. 126). X-rays showed no active chest disease (Tr. p. 129).

Burrows underwent a sleep study in September 2007 (Tr. pp. 139-140), and was diagnosed with severe obstructive sleep apnea with severe recurrent desaturation, and resulting sleep fragmentation (Tr. p. 14).

At his September 2007 administrative hearing, Burrows testified that he was 37 years old, 6'2" tall, weighed 415 pounds, lived with his wife, two children, and mother-in-law, his wife worked and he received food stamps, and he did not drink alcohol, smoke, or abuse drugs (Tr. pp. 149-150). Burrows testified that he completed high school, can read, write, and do basic math, and did not drive because he had an outstanding ticket for which he had lost his license (Tr. pp. 150-151). Burrows testified he last worked as a cashier for three weeks at a gas station, but quit working because he kept getting dizzy (Tr. p. 151).

Burrows testified that he became disabled on February 15, 2006, because he had been having problems with breathing, chronic chest pain, and dizziness, which the doctor diagnosed as congestive heart failure (Tr. pp. 156-157). Burrows testified he was prescribed blood pressure medication, but he didn't have insurance to pay for it (Tr. p. 157). Burrows testified he has worked since February 15, 2006 - he worked at Wal-Mart until April 2006 and he worked three weeks at a gas station in July 2007 (Tr. pp. 157-158).

Burrows testified that he has had congestive heart failure and he has an enlarged heart on the left side (Tr. pp. 158-159). Burrows testified he takes strengthening medication for his heart and blood pressure medication, he is on a diet, and he is walking four to five blocks (about 45 minutes) every day (Tr. pp. 159, 170). Burrows testified he had lost about 18 pounds (Tr. p. 161). Burrows testified that, since he began taking medication, his chest pains are not as frequent; Burrows has chest pain about every other day, if he moves around a lot at one time and gets dizzy (Tr. p. 160). Burrows does not have any medication side-effects (Tr. p. 169). Burrows takes a nitroglycerin pill about every other day (Tr. p. 160). Burrows testified that his blood pressure is controlled by his medication (Tr. p. 160). Burrows further testified that, about a year ago, he had bad stomach pains and was diagnosed with a partial hernia which did not need surgical repair unless it progressed (Tr. pp. 160-161).

Burrows testified that he uses a CPAP breathing machine at night for his sleep apnea, and that he is sleeping better and feeling more rested in the mornings (Tr. p. 162). However, sometimes Burrows has trouble falling asleep (Tr. p. 167). Burrows testified that he has dizziness two or three times a day, if he moves around suddenly or a lot, and that his doctor had advised him to stand up slowly (Tr. p. 162). Burrows testified that he still sees Dr. Craig two or three times a month, and sees Dr. Foret at the Sleep Center regularly (Tr. p. 168). Burrows has a medical card (Tr. p. 169).

Burrows testified that, during the day, if his wife is not home he watches his three year old (two to three times a week), helps around the house by doing things like washing dishes, folding laundry, and picking up after the children (Tr. pp. 163, 166). Burrows testified that he does not watch television (Tr. p. 163), but he reads a lot, up to one hour at a time (Tr. p. 166). Burrows goes grocery shopping with his wife and helps carry the light bags (Tr. p. 164). Burrows testified that he can carry a gallon of milk (Tr. p. 164). Burrows testified that they go out to eat two or three times a month, visit friend and relatives two or three times a week, and attend church twice a week (Tr. pp. 164-165). Burrows testified that he mows the yard with a push mower (motorized but not self-propelled) every two to three weeks, but he has to stop and rest periodically while he mows (Tr. p. 165). Burrows is able

to take care of his personal needs (Tr. p. 166). Burrows and his wife play dominos and cards, and he plays games like checkers with his children (Tr. p. 167).

Burrows testified that he can walk about 45 minutes, stand for fifteen to twenty minutes, sit without any problems, walk up a few steps but not a flight of stairs, and can reach up or to the front (Tr. p. 170). Burrows testified that he can probably pick up and carry 30 to 35 pounds across a room 25 to 30 times in an hour for the first hour, then less often afterward (Tr. p. 171). Burrows testified he can stoop and pick up a pencil, can kneel and squat, can hold things with his hands, can pick up small things with his fingertips, can concentrate and pay attention, can follow simple one or two-step instructions, can be around and interact with people, and can focus and complete a task on time (Tr. pp. 171-173). Burrows testified that stress, crowds, smoke, dust, heat, cold, and pollen bother him, but noise does not (Tr. p. 173).

The VE testified that Burrows' past relevant work as a cashier was light work, his work as a fast food worker was light work, his job as a grocery store manager was light work, as job as a stocker was heavy work, his job as an unarmed security guard was light work, and his job as a retail salesperson was light work (Tr. p. 175). In response to a hypothetical question involving a person of 36 to 37 years old with 12 years education, and the ability to perform light work except to work involving concentrated exposure

to fumes, odors, dust, gases, or poor ventilation, and more than occasional "posturals," the VE testified the person could perform Burrows' past relevant work as a fast food worker, a grocery store manager, and a sales person (Tr. p. 176). In response to a modified hypothetical in which the person can only stand and walk two noncontinuous hours in an eight hour day, the person could work in sales support (sedentary to light work, 80,189 jobs nationally, 1450 jobs in Louisiana) or as a dispatcher (non-911 jobs)(sedentary to light work, 112,099 jobs nationally, 2262 jobs in Louisiana).

## Scope of Review

In considering Social Security appeals such as the one that is presently before the Court, the Court is limited by 42 U.S.C. §405(g) to a determination of whether substantial evidence exists in the record to support the Commissioner's decision and whether there were any prejudicial legal errors. McQueen v. Apfel, 168 F.3d 152, 157 (5th Cir. 1999). For the evidence to be substantial, it must be relevant and sufficient for a reasonable mind to support a conclusion; it must be more than a scintilla but need not be a preponderance. Falco v. Shalala, 27 F.3d 160, 162 (5th Cir. 1994), citing Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 482 (1971). Finding substantial evidence does not involve a simple search of the record for isolated bits of evidence which support the Commissioner's decision but must include a scrutiny of the record as a whole. The substantiality of the

evidence must take into account whatever in the record fairly detracts from its weight. <u>Singletary v. Bowen</u>, 798 F.2d 818, 823 (5th Cir. 1986).

A court reviewing the Commissioner's decision may not retry factual issues, reweigh evidence, or substitute its judgment for that of the fact-finder. <u>Fraga v. Bowen</u>, 810 F.2d 1296, 1302 (5th Cir. 1987); <u>Dellolio v. Heckler</u>, 705 F.2d 123, 125 (5th Cir. 1983). The resolution of conflicting evidence and credibility choices is for the Commissioner and the ALJ, rather than the court. <u>Allen v. Schweiker</u>, 642 F.2d 799, 801 (5th Cir. 1981). Also, <u>Anthony v. Sullivan</u>, 954 F.2d 289, 295 (5th Cir. 1992). The court does have authority, however, to set aside factual findings which are not supported by substantial evidence and to correct errors of law. <u>Dellolio</u>, 705 F.2d at 125. But to make a finding that substantial evidence does not exist, a court must conclude that there is a "conspicuous absence of credible choices" or "no contrary medical evidence." <u>Johnson v. Bowen</u>, 864 F.2d 340 (5th Cir. 1988); <u>Dellolio</u>, 705 F.2d at 125.

<u>ALJ's Findings</u>

To determine disability, the ALJ applied the sequential process outlined in 20 C.F.R. §404.1520(a) and 20 C.F.R. §416.920(a). The sequential process required the ALJ to determine whether Burrows (1) is presently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent

to those in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Appendix 1"); (4) is unable to do the kind of work he did in the past; and (5) can perform any other type of work.  If it is determined at any step of that process that a claimant is or is not disabled, the sequential process ends.  A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis.  Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994), cert. den., 914 U.S. 1120, 115 S.Ct. 1984, 131 L.Ed.2d 871 (1995), citing Lovelace v. Bowen, 813 F.2d 55, 58 (5th Cir.1987).

To be entitled to benefits, an applicant bears the initial burden of showing that he is disabled.  Under the regulations, this means that the claimant bears the burden of proof on the first four steps of the sequential analysis.  Once this initial burden is satisfied, the Commissioner bears the burden of establishing that the claimant is capable of performing work in the national economy. Greenspan, 38 F.3d at 237.

In the case at bar, the ALJ found that Burrows has not engaged in substantial gainful activity since February 15, 2006, and that he has severe impairments of hypertension, obesity and degenerative joint disease, but that he does not have an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1 (Tr. p. 14).  The ALJ then found that, as of November 29, 2007, Burrows was still able to perform his past

relevant work as a grocery store manager (Tr. pp. 18, 19).  The
sequential analysis thus ended at Step 4, with a finding that
Burrows was not disabled (Tr. p. 19).

Issue No. 1 - Development of the Record

Burrows contends the ALJ and the Appeals Council erred in
failing to properly develop the record in light of Burrows'
unrepresented status, which resulted in a decision that was flawed
throughout the evaluation process.

The ALJ's obligation to develop a full and fair record rises
to a special duty when an unrepresented claimant unfamiliar with
the hearing procedure appears before him.  This duty requires the
ALJ to scrupulously and conscientiously probe into, inquire, and
explore for all relevant facts.  The failure of the ALJ to develop
an adequate record is not, however, ground for reversal per se.  As
in the case of hearing held without waiver of the right to counsel,
the claimant must, in addition, show that he was prejudiced as a
result of a scanty hearing.  He must show that, had the ALJ done
his duty, he could and would have adduced evidence that might have
altered the result.  If the plaintiff's subjective symptoms are
linked to a medically determinable component, the ALJ is required
to consider the symptoms and emotions of the claimant; it is the
duty of the ALJ to inquire further in the existence or nonexistence
of distress sufficient to be disabling.  The duty does not exact a
lengthy hearing or protracted inquiry.  It does exact a careful

effort to make a complete record.  <u>Kane v. Heckler</u>, 731 F.2d 1216, 1219-20 (5th Cir. 1984), and cases cited therein.  Also, <u>Carey v. Apfel</u>, 230 F.3d 131, 142 (5th Cir. 2000); <u>Brock v. Chater</u>, 84 F.3d 726, 728 (5th Cir. 1996); <u>Carrier v. Sullivan</u>, 944 F.2d 243, 245 (5th Cir. 1991); <u>James v. Bowen</u>, 793 F.2d 702, 704 (5th Cir. 1986). The ALJ has the duty to develop the relevant facts so that he can fully and fairly evaluate the case.  <u>James</u>, 793 F.2d at 705.  The court will reverse the decision of the ALJ as not supported by substantial evidence if the claimant shows (1) that the ALJ failed to fulfill his duty to adequately develop the record, and (2) that the claimant was prejudiced thereby.  <u>Brock</u>, 84 F.3d at 728.  Also, <u>James</u>, 793 F.2d at 704.

1.

Burrows contends the ALJ erred in finding Burrows' testimony as to his physical limitations was "not entirely credible" and that the objective medical evidence did not fully support Burrows' subjective complaints.  More specifically, Burrows claims the ALJ erred in finding no corroboration of Dr. Craig's diagnosis of congestive heart failure in the medical records.  Burrows argues the his prescriptions for Isosorbide and Nitroquick to treat his chest pain, and the February 2007 chest x-ray showing "cardiomegaly, right heart border" support the diagnosis.  Burrows further argues the ALJ had a duty to seek additional evidence or clarification from Dr. Craig if his diagnosis did not appear to be

based on medically acceptable clinical and laboratory diagnostic techniques.

First, it is noted that Dr. Craig's notes of congestive heart failure were made in February 2005 (Tr. p. 116), March 2006 (Tr. p. 115), and October 2006 (Tr. p. 141). A chest x-ray in February 2006, taken due to Burrows' complaints of shortness of breath and chest pain, showed his heart was normal (Tr. p. 114). A pulmonary CT scan taken in February 2006 was normal (Tr. p.1 13). Burrows was diagnosed with non-cardiac chest pain and gastroesophageal reflux disease and prescribed Pepcid (Tr. p. 109).

The February 2007 chest x-ray indicating cardiomegaly[2] also showed that Burrows' pulmonary artery was okay, with no infiltrates or effusion, and his cardiac enzymes were normal (Tr. p. 126). Burrows' heart size was found to be at the upper limits of normal, with normal background vasculature and had no active chest disease (Tr. p. 129). Burrows' EKG, also done in February 2007, showed normal sinus rhythm with nonspecific ST and/or T wave changes (Tr. p. 125). The cardiovascular examination showed no significant abnormality, no gallops, no murmur, no rugs, and a regular rhythm (Tr. p.1 24).

Burrows' burden was to prove that he was disabled within the

---

[2] "Cardiomegaly" means "enlargement of the heart." MEDLINEplus Health Information, Merriam-Webster Medical Dictionary: cardiomegaly, *available at* http://www.nlm.nih.gov/mplusdictionary.html (a service of the U.S. National Library of Medicine and the National Institutes of Health).

meaning of the Social Security Act.  That requirement means that he must show a "medically determinable" impairment and that he is unable "to engage in substantial gainful activity".  <u>Greenspan v. Shalala</u>, 38 F.3d 232 (5th Cir. 1994), cert. den., 514 U.S. 1120, 115 S.Ct. 1984 (1995); 20 C.F.R. §423(d)(1)(A) and (d)(3); 20 C.F.R. §404.1508; 42 U.S.C. §423(d)(1)(A).  A medically determinable impairment is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.  42 U.S.C. § 423(d)(3); <u>Hames v. Heckler</u>, 707 F.2d 162, 165 (5th Cir. 1983).  The weight to be given a physician's statement is dependent upon the extent it is supported by specific clinical findings.  <u>Elzy v. Railroad Retirement Board</u>, 782 F.2d 1223, 1225 (5th Cir. 1986); <u>Jones v. Heckler</u>, 702 F.2d 616, 621 (5th Cir. 1983).  An acceptable medical opinion as to disability must contain more than a mere conclusory statement that the claimant is disabled.  It must be supported by clinical or laboratory findings.  <u>Oldham v. Schweiker</u>, 660 F.2d 1078, 1084 (5th Cir. 1981).

Since Burrows' heart size was within the normal size range, and there were no indications of congestive heart failure on the x-rays or EKG, the ALJ did not err in finding 2006 Dr. Craig's diagnosis of "congestive heart failure" is unsupported by the objective medical evidence; there are no medical tests in the

record, either before or after Dr. Craig's diagnoses, which indicate that Burrows has suffered from congestive heart failure.

Moreover, the ALJ did not err in failing to recontact Dr. Craig for additional evidence or clarification of his diagnosis of congestive heart failure. Dr. Craig's "diagnosis" of congestive heart failure appears to be only a preliminary diagnosis based on Burrows' subjective complaints, rather than a final diagnosis. There are diagnostic tests of Burrows' heart and lungs in the administrative record which both pre-date and post-date Dr. Craig's diagnosis of congestive heart failure, and which show there Burrows does not have congestive heart failure. Therefore, no clarification from Dr. Craig was necessary.

Since Burrows failed to carry his burden of proving, by medically acceptable clinical and laboratory diagnostic techniques, that he has or had congestive heart failure, this ground for relief is meritless.

2.

Burrows also contends the ALJ failed to properly develop the record with regard to his complaints of knee and hip pain and leg swelling.

Burrows complained of knee and hip pain, as well as shortness of breath, to Dr. Craig in February 2005 (Tr. p. 116). Dr. Kenny noted, in September 2006, that Burrows complained of occasional edema in his feet and ankles, and painful knees when he has been on

his feet all day, but he did not have any pain or swelling on the date of the exam (Tr. pp. 117-120). On February 20, 2007, when Burrows went to the emergency room with complaints of chest pain, coughing, and congestion, there was evidence of pedal edema (ankle or foot swelling) noted (Tr. p. 124). Burrows testified at his hearing that he can walk for about 45 minutes, stand for fifteen to twenty minutes, walk up a few steps but not a flight of stairs, can stoop and pick up a pencil, can kneel and squat, and can probably pick up and carry 30 to 35 pounds across a room 25 to 30 times in an hour for the first hour, then less often afterward. Burrows testified that he walks about 45 minutes every day as part of his weight loss program.

There is very little evidence regarding Burrows' knee and hip pain and edema in his feet. The medical records show two complaints of knee and hip pain - one in 2005 and one in 2006, and two instances of edema - one in 2006 and one in 2007. Burrows testified that he quit his last job because he was dizzy, not because of hip and knee pain and edema in his feet. Although Burrow argues that hip and knee x-rays might have revealed some impairment, it is not the ALJ's duty to ferret out a claimant's previously undiscovered impairments. It is the claimant's burden to prove he has a medically determinable impairment.

Again, Burrows has not proven that he had a medically determinable impairment which causes knee and hip pain and edema in

17

his feet and ankles, and has not pointed to any additional evidence which the ALJ could and should have adduced with regard to those complaints that might have altered the result in this case.

This ground for relief is also meritless.

Issue 2 - Residual Functional Capacity

Burrows also contends the ALJ erred in assessing his residual functional capacity, resulting in an erroneous determination that he could return to his past relevant work or perform other work. Specifically, Burrows contends the ALJ failed to properly consider his extreme obesity during the evaluation process.

A claimant's impairments may cause physical or mental limitations that affect what he can do in a work setting. Residual functional capacity is a medical assessment, based upon all of the relevant evidence, of the work a claimant can perform despite his or her limitations. 20 C.F.R. §404.1545, §416.945. Although the burden of proof in a disability case is on the claimant to show that he is unable to perform his usual line of work, once that fact is established, the burden shifts to the Commissioner to show the claimant is able to perform some other kind of substantial work available in the national economy. Herron v. Bowen, 788 F. 2d 1127, 1131 (5th Cir. 1986), and cases cited therein. Also, Babineaux v. Heckler, 743 F.2d 1065, 1067 (5th Cir. 1984). The Commissioner has the burden to establish a claimant's residual functional capacity. Leggett v. Chater, 67 F.3d 558, 565 (5th Cir.

1995).

For cases at the administrative law judge hearing level, the ALJ has the responsibility for deciding a claimant's residual functional capacity. 20 C.F.R. § 404.1546, § 416.946. The ALJ must perform a "function-by-function" assessment of the claimant's ability to engage in work-related activities when making his RFC determination. SSR 96-8p. When making the RFC determination an ALJ must consider objective medical facts, diagnoses and medical opinion based on such facts, and subjective evidence of pain or disability testified to by the claimant or others. 20 C.F.R. § 404.1545(a). Moreover, the ALJ must specify the evidentiary basis for his RFC determination. SSR 96-8p. Myers v. Apfel, 238 F.3d 617, 620 (5th Cir. 2001).

Obesity should be considered in combination with other impairments in making the residual functional capacity determination and in discussing the claimant's ability to perform sustained work activities. Beck v. Barnhart, 205 Fed.Appx. 207, 212 (5th Cir. 2006), citing SSR 02-1p. When obesity is identified as a medically determinable impairment,[3] the ALJ must consider any

_____

[3] "Obesity" is a term used to describe body weight that is much greater than that which is considered healthy. Adults with a BMI greater than 30 are considered obese. Anyone more than 100 pounds overweight or with a BMI greater than 40 is considered morbidly obese. Obesity is a significant health threat because the extra weight puts unusual stress on all parts of the body, and it increases the risk of diabetes, stroke, heart disease, kidney disease, gallbladder disease, high blood pressure, high cholesterol, some types of cancer, osteoarthritis, and sleep

functional limitations resulting from the obesity in the RFC assessment, in addition to any limitations resulting from any other physical or mental impairments identified. SSR 02-1P, *7, "Evaluation of Obesity."

The ALJ states in her opinion that she considered all of Burrows' impairments-hypertension, sleep apnea, and obesity-in combination in determining his residual functional capacity (Tr. p. 18). The ALJ discussed the impact of Burrows' obesity on his ability to work by considering what Burrows is physically able to do, given the cumulative effects of all of his impairments.

The ALJ found Burrows can perform light work. "Light work" is defined in 20 C.F.R. § 404.1567(b) and § 416.967(c) as follows:

> "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities."

Neither Burrows' testimony nor the medical records were inconsistent with the ability to perform light work. Burrows' past work as a grocery store assistance manager, as described by

---

apnea. MEDLINEplus Health Information, Medical Encyclopedia: Obesity, *available at* http://www.nlm.nih.gov/medlineplus/encyclopedia.html (a service of the U.S. National Library of Medicine and the National Institutes of Health).

Burrows, was light work (Tr. p. 55) and was within the range of his physical abilities.[4]

Since the ALJ did not disregard Burrows' obesity in determining his residual functional capacity, this issue is meritless.

Conclusion

_____Based on the foregoing discussion, IT IS RECOMMENDED that Burrows' appeal be DENIED AND DISMISSED WITH PREJUDICE.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), the parties have **ten (10) business days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **ten (10) days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the district judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN TEN (10) BUSINESS DAYS FROM THE DATE OF ITS SERVICE SHALL**

---

[4] In any event, the VE testified that, even if Burrows were restricted to standing or walking to a total of only two hours in an eight hour day, Burrows could still work in sales support or as a dispatcher (non-911), both of which are sedentary to light work.

**BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UN-OBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED at Alexandria, Louisiana, on this 27th day of February, 2009.


JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE